UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Troy McMaster,

      Plaintiff,

v.                                                    Case No. 18-13875

Kohl's Department Stores, Inc.,          Sean F. Cox
                                                       United States District Court Judge
      Defendant.

_____/

**OPINION & ORDER
GRANTING IN PART, AND DENYING IN PART,
DEFENDANT'S SUMMARY JUDGMENT MOTION**

Plaintiff Troy McMaster ("Plaintiff or "McMaster") filed this action against his former

employer, Defendant Kohl's Department Stores, Inc. ("Defendant" or "Kohl's"), asserting

employment discrimination claims.  The matter is currently before the Court on Defendant's

Motion for Summary Judgment, filed after the close of discovery.  The parties have briefed the

issues and the Court heard oral argument on February 4, 2021.  For the reasons set forth below,

the Court shall grant the motion in part and deny it in part.  The Court shall grant summary

judgment in Defendant's favor as to Plaintiff's sex discrimination claim but shall deny the

motion in all other respects.

**BACKGROUND**

On December 13, 2018, McMaster filed this employment discrimination claim against his

former employer, Kohl's.

At this juncture, the operative complaint is Plaintiff's Amended Complaint, filed on April

10, 2020.  (ECF No. 66).  It asserts the following three counts: 1) "Age Discrimination" in

1

violation of the Age Discrimination in Employment Act ("ADEA") (Count One); 2) "'Regarded As Disabled' Disability Discrimination," brought under the Americans with Disabilities Act ("ADA") (Count Two); and 3) "Sex Discrimination" brought under the Elliott-Larsen Civil Rights Act ("ELCRA") (Count Three).

Discovery in the case has closed and, under current Scheduling Order (ECF No. 78), the deadline for filing dispositive motions was October 5, 2020.

This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

Both parties filed summary judgment motions. As explained in an Order issued on November 16, 2020, however, this Court struck Plaintiff's summary judgment motion from the docket. (*See* ECF No. 94). That order also required Plaintiff to file a compliant brief in response to Defendant's summary judgment motion.

Defendant complied with the Court's practice guidelines for summary judgment motions

2

such that its motion includes a "Statement of Material Facts Not In Dispute" ("Def.'s Stmt."). After this Court ordered him to do so, Plaintiff ultimately complied with the guidelines and filed a "Counter-Statement of Disputed Facts" (ECF No. 96) ("Pl.'s Stmt.").

The relevant evidence submitted by the parties, *viewed in the light most favorable to McMaster*, the non-moving party, is as follows.

McMaster is a 54 year-old male who was born in August of 1966.

McMaster was employed by Kohl's from February 1987 to March 2018, when Kohl's terminated his employment.  (Stmts. at ¶¶ 2-3).

Kohl's initially hired McMaster as a Loss Prevention Officer (Stmts. at ¶ 8) but he was promoted to the position of Regional Loss Prevention Manager ("RLPM") years ago and held that position at all relevant times.

As an RLPM, McMaster was responsible for developing and implementing loss prevention strategies for his five districts, achieving goals related to inventory shortage, budget lines, cash variance, and operational compliance, and developing and managing the Loss Prevention employees in his region.  He was also expected to work closely with his business partner, Loretta Roszczewski ("Roszczewski"), the Vice President and Regional Manager for Region 11, to accomplish the region's goals.  (Stmts. at ¶¶ 11-12).

McMaster's region, Region 11, was based in Troy, Michigan and a part of Territory 2. It was comprised of five Districts (7, 15, 16, 31, and 72) and had 61 stores.  There were three other regions in Territory 2: Region 1 based in Chicago, Region 7 based in Minneapolis, and Region 6 based in Milwaukee.  (Stmts. at ¶¶ 5-7).

During McMaster's first six years as an RLPM, he was given performance evaluations

3

finding that Plaintiff's performance met, but never exceeded, expectations.  (Stmts. at ¶ 13, Pl.'s Dep. at 54).

In April of 2011, David Ruffing ("Ruffing") became the Vice President of Loss Prevention for Territory 2 and McMaster began reporting directly to him.  Kohl's operates on a February 1 through January 31 fiscal year, i.e. the 2016 fiscal year ("FY 2016") began on February 1, 2016 and ended on January 31, 2017.  (Stmts. at ¶¶ 14-15).

Kohl's was organized into four territories and 16 regions.  Each territory had a Vice President of Loss Prevention and each region had a Regional Loss Prevention Manager ("RLPM") who reported to the territory Vice President.  (Stmts. at ¶ 4).  Plaintiff was the RLPM for Region 11 and reported to Ruffing.  Ruffing had other RLPMs who reported to him, including Kelly Castiglioni, Nick Hund, and Matt Poppalardo.  (Pl.'s Dep. at 34).

In April of 2012, Ruffing met with McMaster to deliver his FY 2011 performance review.  Plaintiff received an overall rating of "Effective" (3.7 on a scale of 6).  (Stmts. at ¶¶ 14-16).  In that review, Ruffing included that McMaster delivered strong inventory shortage results; leveraged his business partners for Loss Prevention committee work; was prepared for meetings, calls and store visits; and developed and managed his new direct reports.  (Stmts. at 17; Def.'s Ex. 3).  But Ruffing also made comments about areas for improvement, such as: "External/intern productivity, markdown compliance, and audit results must be a top focus in 2012," and "Troy must identify/motivate/resolve performance deficiencies in this veteran direct reports."  (Def.'s Ex. 3).

In 2013, McMaster was given his 2012 performance review, wherein Ruffing gave McMaster an overall rating of "Satisfactory."  Like the 2011 review, this 2012 review included

both positive comments and comments about areas for improvement.  (Stmts. at 20; Def.'s Ex. 4). It noted that McMaster's Region 11 had an "Overall Scorecard Rank:  14 of 18."

In 2014, McMaster was given his 2013 performance review, wherein Ruffing gave McMaster an overall rating of "Effective."  That review again contained both positive comments and comments about areas for improvement.  (Stmts. at ¶ 23; Def.'s Ex. 5).  It noted that McMaster's Region 11 had an "Overall Scorecard Rank: 6 of 18."  (*Id*.).

In January of 2015, McMaster took a short-term disability leave for depression and anxiety.  (Stmts. at ¶ 25; ECF No. 80-7 at PageID.1492).  McMaster returned to work on or about March 3, 2015.  (*Id*.).

In the spring of 2015, McMaster was given his 2014 performance review, wherein Ruffing gave McMaster an overall rating of "Effective."  (Def.'s Ex. 7).  It noted that McMaster's Region 11 had an "Overall Scorecard Rank: 3 of 18."

In 2016, McMaster was given his 2015 performance review, wherein Ruffing gave McMaster an overall rating of "Fully Meets."  In the comments section, Ruffing noted "Overall regional result of #3.  Inventory at goal with the third lowest shrink in territory."  (Def.'s Ex. 8). Ruffing's comments included both positive comments and some areas for improvement.  His comments about McMaster included: "2015 was another strong year for Troy," "Troy is a pleasure to have on our team in every way.  He gives thoughtful feedback on our approach and direction and readily owns performance in his region," "Troy has an extremely positive reputation within the division and company overall."  (*Id*.).

On or about March 7, 2016, Ruffing and McMaster had a brief conversation in Kentucky, after a Loss Prevention meeting.  (Stmts. at ¶ 36).  Ruffing contends that he raised performance

issues with McMaster during that conversation, but McMaster does not recall such issues having been raised. (Pl.'s Dep. at 106-09). Kohl's submitted an email of Ruffing's personal notes, sent to Jay Schrader at Kohl's, that it contends Ruffing made to document his conversation. (Def.'s Ex. 13). But no one from Kohl's sent any kind of writing to McMaster to document the alleged the conversation.

On April 5, 2017, Ruffing met with McMaster to deliver his 2016 review. (Stmts. at ¶ 52). In his 2016 performance review, Ruffing gave McMaster an overall rating of "Effective." (Stmts. at ¶ 53). It noted "#11 overall RLPM scorecard ranking." (Def.'s Ex. 19). Like the other reviews given to McMaster, it included both positive comments from Ruffing and comments about areas for improvement.

Unbeknownst to Ruffing, McMaster recorded the April 5th meeting. McMaster testified that he did so because he was concerned that Ruffing may bring up medical issues. (Stmts. at ¶¶ 55 & 50).

Ruffing testified that after that review, sometime during 2017, McMaster's performance declined. (Ruffing Dep. at 135-36). Ruffing testified:

> Q. When did you first have a conversation with anyone about terminating Troy?
> A. Sometime in 2017, I can't pinpoint it, but sometime around March or April in 2017.
> Q. How did it come about?
> A. Again, I don't remember the specific conversation.
> Q. Well, what do you recall about it?
> A. I just remember it.
> Q. A specific conversation, did you broach the subject, did someone broach it with you?
> A. I just remember in early 2017 around review time having a conversation with my boss about Troy and concerns with the performance, and that we would have to continue to watch it close and determine *we might have to take next steps if his performance didn't improve.*

6

Q.     But you [sic] conferring with your boss after Troy's review, his 2017 review for 2016?

A.     No, I'm not certain of the timing.  I was sometime in 2017.

Q.     I thought you said it was around review time?

A.     Sometime around review time in 2017, I can't pinpoint it.

Q.     So review time is March or April?

A.     Yes.

Q.     So you gave him a satisfactory performance review, and then went to your boss and talked about terminating him?

A.     No.  Again, I'm not exactly sure of the timing when that conversation occurred.

Q.     Well, even if it was a month or two later, let's just say, so you had this review with Troy in March or April, and then April or May turned about and wen to your boss and talked about terminating him?

A.     At some point in that spring, yes, I had a conversation. It wasn't necessarily terminating him.  *It was about, what will [be] next steps if he is unable to improve his performance.*

Q.     And *next steps could have been a 30/60/90, correct?*

A.     *My understanding at that time, yes.*

(Ruffing Dep. at 148-49) (emphasis added).

On September 29, 2017, Ruffing e-mailed himself "Troy Notes" (ECF No. 95-25) that

stated:

> Texted me and asked if could talk
> Was concerned had to keep stepping away from visits because he was sweating
> Said doctor thinks it could be panic attacks
> Went to doctor earlier and had one, he told doctor that he couldn't live this way.
> Doctor took as suicide threat and contacted ambulance which troy refused.
> Doctor said he needs to go to psychiatrist but Troy said last thing he needs is more pills
> Said he was embarrassed to bring it up with Joe because Joe would think a mental illness was weak
> Sent texts later saying he would never put me in a bad spot if he thought he couldn't do his job
> Assured him it was ok to step away from visits if not feeling well
> Assured him no one would be judgemental [sic] on his challenges
> Assured him just want him to feel better.

(*Id*.).

McMaster testified that on October 24, 2017, he was driving to the airport when he

started getting shortness of breath, which caused him to drive to the hospital. (Pl.'s Dep. at 185-87). McMaster called Ruffing that day and told him that he did not make his flight and was in the hospital. (*Id.*). McMaster went out on a medical leave of absence that day. (*Id.*). On that date, October 24, 2017, McMaster "suffered a heart attack and was hospitalized for the placement of two stents." (Stmts. at ¶ 78).

On October 26, 2017, McMaster emailed Ruffing and others at Kohl's, stating that he had been released from the hospital but had "some restrictions including driving." (ECF No. 95-21).

On November 3, 2017, McMaster emailed Ruffing and Roszczewski saying, "meeting with my cardiologist and primary care physician. They're both urging me to take time off. Have had a few serious setbacks this week. I hope you understand that I would/will do everything possible to get back ASAP." (Pl.'s Dep. at 187-88). Ruffing responded, "No problem at all, Troy. We will be glad to have you back when you're ready." (*Id.*).

McMaster returned to work, from his medical leave of absence, on November 20, 2017. (Pl.'s Dep. at 187).

On December 1, 2017, Ruffing sent himself an mail titled, "Troy Convo 12/1 at 230 PM" that stated, in pertinent part:

> *needs go to cardiologist 3-5 times a week but scheduled during work. does not want to miss calls/meetings. told him he needs to go...let me know what time he need off and when and NP.

> *told him needs to pick up communication during the week. sent him email on Tuesday after he sent something saying "NG" and didn't hear anything back. said I didn't know if he was working or at appts or what. said either way is fine just let me know. told him to pick up the communication with me moving forward (copy me on stuff to DMs and DLPMs/etc... or lemme [sic] know if out)

> *Shared story about medications again (passed out on blood thinners). Upset can't get teeth cleaned because need doctor note.

8

. . . .

*He said managing prescriptions and appointments is nearly impossible.  he said he's hard on himself and doesn't want to miss work. told him other folks would still be on leave so it's ok take whatever time you need.  told him I've never said no and I won't say no if he needs time. said he appreciates that as always.  Did not sound like himself; slow and drawn out like on heavy meds

(ECF No. 80-32).

On December 4, 2017, McMaster emailed Ruffing, stating that he had been having shortness of breath throughout the night and was going to get it checked out.  (Pl.'s Dep. at 191-92).  Ruffing responded, "Okay, let us know how it goes" and said "hope you're doing better." McMaster responded, "I'm waiting for a ride now. They held me for observation.  Blood pressure was high and heart was periodically irregular.  Much better now, just exhausted.  No sleep since Saturday night.  I will be back in the game tomorrow. Thanks for asking!"  (*Id*.).

On December 11, 2017, Kohl's employee Kelli Balogh was concerned about a text from McMaster and called the Macomb County Sheriff's Department and asked them to conduct a wellness check on McMaster, which they did.  (Stmts. at ¶ 87; Pl.'s Dep. at 192-93).  The police officers recommended that McMaster admit himself to McLaren-Macomb Hospital for a psychiatric evaluation and McMaster did so, and stayed the night.  (Pl.'s Dep. at 197-98).

Ruffing testified that he contacted McMaster on December 13, 2017, after his release, and told him he did not want McMaster to return to work if he wasn't 100% ready to be there, and told him if he is back he needs to be 100% engaged in doing his job.  (Def.'s Stmt. at ¶ 89; Ruffing Dep. at 128-29).

On February 16, 2018, Ruffing met with McMaster at the District 7 office in Troy, Michigan and asked him to join a Skype conference with Dallas Moon Senior Vice President,

Human Resources, and Jolene Christensen, Vice President, Human Resources.  (Stmts. at 112).

During that conference, Moon and Christensen informed McMaster that day would be his last

day of work and that Kohl's was terminating his employment effective March 2, 2018.  (Stmts.

at ¶ 113).  Thus, it is undisputed that McMaster's last day of work was February 16, 2018, and

his employment terminated effective March 2, 2018.

In his complaints in this action, McMaster alleges that, after his termination, Kohl's

temporarily assigned some or all of his job duties to a significantly younger employee.  During

his deposition in this case, McMaster testified as follows:

> Q.  Who is the significantly younger person that you're referring to in
> Paragraph 32?
> A.  That would have been Nick Hund.
> Q.  What facts do you have to support your belief that Nick Hund – or strike
> that.
> What facts do you have to support your belief that Kohl's initially
> assigned some or all of your job duties to Nick Hund?
> A.  I was told that he was overlooking the region.  As soon as I was
> terminated he was taking that responsibility.
> Q.  Who told you that?
> A.  I don't recall if it was one of the DLPM's.
> Q.  And whoever it was that told you that said that he was overlooking the
> region until [Kohl's] found your replacement, am I correct?
> A.  No, I didn't know if it was until they found a replacement or if it was
> permanent.
> Q.  Did you end up finding out that it was until they found your replacement?
> A.  I heard that they hired somebody for the position, yes.
> Q.  They hired a person by the name of Ramona Tanksley, correct?
> A.  Yes.
> Q.  And do you have any understanding as to when Ms. Tanksley was hired to
> replace you?
> A.  I do not.
> Q.  When you said that this DLPM or whoever the employee was that told you
> Nick Hund was overlooking Region 11, did that person tell you who it
> was that assigned Mr. Hund to allegedly do that?
> A.  No.
> Q.  Or what job duties he was assuming of yours while he was overlooking
> the region?

A.  I was told that [it] was assuming my job responsibilities.

Q.  In addition to his responsibilities as the regional Loss Prevention manager for Region 6?

A.  Correct.

. . . .

Q.  Do you know who replaced you after your termination?

A.  I now know her name is Ramona, I didn't know her.  I believe she was with [the] company a short amount of time as far as I know.

(Pl.'s Dep. at 251-53 & 298-99).

Employment records produced by McMaster appear to support his testimony that Ramona Tanksley had been hired by Kohl's a few months prior to McMaster's termination.  (*See* ECF No 95-17 at PageID.3493, showing Tanksley's initial hire date as "11/27/17.").

Regardless of when Tanksley was initially hired by the company, Kohl's has presented the Court with undisputed evidence that Tanksley was given the position of RLPM for Region 11 (ie, the position previously held by McMaster) on March 16, 2018.  That was just fourteen days after McMaster's termination.  (*See* ECF No. 98-1).

During his deposition, McMaster testified that he believes that age was a factor in the decision to terminate his employment because he was treated differently "than the younger RLPMs in the territory, both personally and professionally."  (Pl.'s Dep. at 241).  He identified the younger RLPMs in the territory who were treated more favorably as: 1) Matt Poppalardo, 2) Nick Hund, 3) Steve Stauch, 4) Jamie Campbell, and 5) Sean Balducci.  (Pl.'s Dep. at 241-250).  McMaster testified that Ruffing treated those younger RLPMs more favorably than him in that Ruffing would give them more responsibilities and would do things like assigning the younger RLPMs to committees.  McMaster testified that, during the last few years he was at Kohl's, Ruffing would not assign him to such committees, even after he volunteered for them.  McMaster further testified that Ruffing would send other employees for training with the

11

younger RLPMs but stopped sending employees to him for such training.  (*Id.*)

ANALYSIS

McMaster's Amended Complaint alleges age discrimination under the ADEA, disability discrimination under the ADA, and sex discrimination under Michigan's ELCRA.  Kohl's motion seeks summary judgment in its favor as to all three claims.

**I.**    **Age Discrimination Claim Under The ADEA**

Count One of McMaster's Amended Complaint asserts an age discrimination claim under the ADEA.

"The ADEA prohibits employers from terminating employees 'because of such individual's age.' 29 U.S.C. § 623(a)(1)."  *Pelcha v. MW Bancorp, Inc*., __ F.3d __, 2021 WL 97224 at *1 (6th Cir. Jan. 12, 2021).  The Sixth Circuit has explained that:

> Meeting this "because of" requirement is no simple task. Plaintiffs must "prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). That is, they must show that age was the reason why they were terminated, not that age was one of multiple reasons. *Scheick v. Tecumseh Pub. Schs*., 766 F.3d 523, 529 (6th Cir. 2014). Under *Gross*, either a termination is motivated by age, or it wasn't. So, to defeat summary judgment, [the plaintiff] must show a genuine dispute of material fact that, if resolved in [his or] her favor, could persuade a reasonable juror that age was the but-for cause of [his or] her termination.

*Pelcha, supra*.

Like the plaintiff in *Pelcha*, McMaster contends that this framework has been disrupted by a recent Supreme Court decision interpreting Title VII, *Bostick v. Clayton County*, __ U.S. __, 140 S. Ct. 1731, 1739, 207 L.Ed.2d 218 (2020).  (Pl.'s Br. at 3-4).  The Sixth Circuit, however, recently rejected that argument in *Pelcha*.  *Pelcha, supra*, at *2.

McMaster "may show a violation of the ADEA through either direct or circumstantial

12

evidence." *Pelcha, supra*, at *2.

Here, McMaster does not contend that he can establish his ADEA claim with direct evidence. Thus, he must show age discrimination with circumstantial evidence, which is evaluated "using the three-step burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06, 93 S. Ct. 1817, 36 L.Ed. 668 (1973)." *Pelcha, supra*, at *2. That analysis first requires the plaintiff to establish a prima facie case of discrimination. If the plaintiff can do so, "the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the termination." *Id*. "Once the employer identifies a reason, the burden shifts back to the plaintiff to prove the employer's reason is a mere pretext." *Id*. If the plaintiff can do so, then "the factfinder may reasonably infer discrimination." *Id*.

### A. Can McMaster Establish A Prima Facie Case Under The ADEA?

To establish a prima facie case of age discrimination under the ADEA, McMaster must show that: 1) he was a member of a protected class (older than 40 years old); 2) he suffered an adverse employment action; 3) he was qualified for the position held; and 4) he "was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably." *Pelcha, supra* (citing *Geiger v. Tower Auto*., 579 F.3d 614, 622-23 (6th Cir. 2009).). "This light burden is 'easily met' and 'not onerous.'" *Id*. (citations omitted).

Here, for purposes of its motion, Kohl's challenges only the fourth element. (Def.'s Br. at 4).

### 1. Was McMaster Replaced By Someone Outside The Protected Class?

Kohl's first contends that McMaster cannot show he was replaced by a younger employee because McMaster admits he was actually replaced by *an older* employee, Ramona

Tanksley.  (Def.'s Br. at 4).  In making this argument, Kohl's asserts:

> It is undisputed Kohl's replaced Plaintiff with someone four years older than him. Contrary to the allegations in his Amended Complaint, Plaintiff admits he was replaced by Ramona Tanksley as the RLPM for Region 11, not Nick Hund (Ex. 1, 298-299). Tanksley is four years older than Plaintiff (Ex. 41, ¶21). Although Plaintiff initially believed Hund replaced him because another Associate told him Hund started overlooking Region 11 "as soon as I was terminated" (Ex. 1, 252), Plaintiff's last day of work was February 16, 2017 and his termination was not effective until March 2, 2018. While it is true Hund assumed Plaintiff's responsibilities for Region 11 (in addition to his own responsibilities as the RLPM for Region 6) until Kohl's hired Tanksley on March 16, 2017 (Ex. 1, 252-253; Ex. 10, 173), the temporary assignment of an employee's job duties to a younger employee does not constitute "replacement" for purposes of establishing a prima facie case. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 335-336 (6th Cir. 2003).

(*Id.*).

In *Grosjean v. First Energy Corp.*, 349 F.3d 332 (6th Cir. 2003), the plaintiff seeking to

establish a prima facie case of age discrimination argued that the fourth element was met because

he was initially replaced by a younger employee, "who temporarily took over his duties in

addition to his own." *Id*. at 335-36.  The Sixth Circuit rejected that argument and explained, in

pertinent part, that:

> Gallagher's assumption of [the plaintiff's] duties does not constitute replacement under the law of this circuit. A "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes v. GenCorp Inc*., 896 F.2d 1457, 1465 (6th Cir. 1990) (citing *Sahadi v. Reynolds Chem*., 636 F.2d 1116, 1117 (6th Cir. 1980)); *see also Lilley v. BTM Corp*., 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."); *Godfredson v. Hess & Clark*, 173 F.3d 365, 372–73 (6th Cir. 1999) (reaffirming *Barnes*, 896 F.2d at 1465).

*Id*. at 336.

In response to the pending motion, McMaster does not dispute that Tanksley is older than

14

McMaster.  Rather, he continues to argue that Kohl's replaced McMaster with Hund, who is significantly younger than McMaster – without addressing the above law set forth in *Grosjean*. (Pl.'s Br. at 8).

It is undisputed that McMaster's last day of work was February 16, 2018, and his employment with Kohl's terminated effective March 2, 2018.

In his complaints in this action, McMaster alleges that, after his termination, Kohl's *temporarily assigned* some or all of his job duties to a significantly younger employee, Nick Hund, but then filled McMaster's position with Ramona Tanksley.

During his deposition in this case, McMaster then testified as follows:

> Q.   Who is the significantly younger person that you're referring to in Paragraph 32?
> A.   That would have been Nick Hund.
> Q.   What facts do you have to support your belief that Nick Hund – or strike that.
>       What facts do you have to support your belief that Kohl's initially assigned some or all of your job duties to Nick Hund?
> A.   I was told that he was overlooking the region.  As soon as I was terminated he was taking that responsibility.
> Q.   Who told you that?
> A.   I don't recall if it was one of the DLPM's.
> Q.   And whoever it was that told you that said that he was overlooking the region until [Kohl's] found your replacement, am I correct?
> A.   No, I didn't know if it was until they found a replacement or if it was permanent.
> Q.   Did you end up finding out that it was until they found your replacement?
> A.   I heard that they hired somebody for the position, yes.
> Q.   They hired a person by the name of Ramona Tanksley, correct?
> A.   Yes.
> Q.   And do you have any understanding as to when Ms. Tanksley was hired to replace you?
> A.   I do not.
> Q.   When you said that this DLPM or whoever the employee was that told you Nick Hund was overlooking Region 11, did that person tell you who it was that assigned Mr. Hund to allegedly do that?
> A.   No.

15

> Q.   Or what job duties he was assuming of yours while he was overlooking
>      the region?
> A.   I was told that [it] was assuming my job responsibilities.
> Q.   *In addition to his responsibilities as the regional Loss Prevention*
>      *manager for Region 6?*
> A.   *Correct.*
> . . . .
> Q.   Do you know *who replaced you after your termination*?
> A.   *I now know her name is Ramona*, I didn't know her.  I believe she
>      was with [the] company a short amount of time as far as I know.

(Pl.'s Dep. at 251-53 & 298-99). (emphasis added).

Employment records produced by Kohl's and submitted by McMaster appear to support

McMaster's testimony that Ramona Tanksley had been hired by Kohl's a few months prior to

McMaster's termination.  (*See* ECF No 95-17 at PageID.3493, listing Tanksley's initial hire date

as "11/27/17.").

But regardless of when Tanksley was initially hired by the company, Kohl's has

presented the Court with undisputed evidence that Tanksley was given the position of RLPM for

Region 11 (ie, the position previously held by McMaster) on March 16, 2018.  That was just

fourteen days after McMaster's termination.  (*See* ECF No. 98-1).

Under *Grosjean*, McMaster cannot be considered replaced by Hund, who was not given

the position of RLPM for Region 11, but rather, temporarily assumed some or all of those duties

*in addition* to those of his own position.

This Court finds that McMaster has not met the fourth element of a prima facie age

discrimination claim by virtue of having been replaced by someone outside of the protected

class.

**2.     Can McMaster Show That Similarly Situated Non-Protected**
**        Employees Were Treated More Favorably ?**

16

McMaster also seeks to establish the fourth element of a prima facie case of age discrimination by showing that similarly situated non-protected (ie, younger) employees were treated more favorably than him.

During his deposition, McMaster testified that he believes that age was a factor in the decision to terminate his employment because he was treated differently "than the younger RLPMs in the territory, both personally and professionally."  (Pl.'s Dep. at 241).  McMaster identified the younger RLPMs in the territory who were treated more favorably as: 1) Matt Poppalardo, 2) Nick Hund, 3) Steve Stauch, 4) Jamie Campbell, and 5) Sean Balducci.  (Pl.'s Dep. at 241-250).

McMaster testified that Ruffing treated those younger RLPMs more favorably than him in that Ruffing would give them more responsibilities and would do things like assigning the younger RLPMs to committees.  McMaster testified that, during the last few years he was at Kohl's, Ruffing would not assign him to such committees, even after he volunteered for them. McMaster further testified that Ruffing would send other employees for training with the younger RLPMs but stopped sending employees to him for such training.  (*Id.*)

Viewing the evidence in a light most favorable to McMaster, the Court concludes that he has submitted sufficient evidence to establish the fourth element of his prima facie case of age discrimination.

> **B.    Can McMaster Show That Kohl's Legitimate, Nondiscriminatory Reason For His Termination Is A Pretext For Age Or Disability Discrimination?**

Even if McMaster can establish a prima facie case of age (or disability) discrimination, Kohl's contends it is still entitled to summary judgment because it has offered a legitimate, nondiscriminatory reason for McMaster's termination and McMaster cannot meet his burden of

showing prextext.

### 1. Kohl's Stated Reason For McMaster's Termination

Kohl's has offered, as its legitimate, nondiscriminatory reason for terminating McMaster's employment, McMaster's "his failure to correct numerous performance deficiencies Ruffing had coached him on over many months."  (Def.'s Br. at 11).

McMaster asserts that Kohl's has not met its burden as to it stated reason for his termination.  In making this argument, McMaster directs the Court to *E.E.O.C. v. Target Corp*., 460 F.3d 946 (7th Cir. 2006).  In that case, the Seventh Circuit explained that the defendant must present evidence in support of its stated reason and the "employer must explain" its claimed legitimate, non-discriminatory reason for the challenged action "clearly enough to allow the court to focus its inquiry on whether the employer honestly believed that reason" and "allow the plaintiff to identify the kind of evidence it must present to demonstrate that the reason is a pretext."  *Id*. at 957.  McMaster asserts that, in this case, Kohl's has "produced no documents supporting its asserted business reason for McMaster's termination" and argues that "the presumption of discrimination that arose upon plaintiff's presentation of a prima facie case *remains unrebutted*."  (Pl.'s Br. at 11) (emphasis added).

While McMaster's complaint about the lack of specificity of Kohl's proffered explanation is not entirely without merit, for purposes of this motion, the Court finds that Kohl's has met its burden.

### 2. Can McMaster Show Pretext?

Once Kohl's has met its burden as to its proffered legitimate nondiscriminatory reason for McMaster's termination, the burden shifts back to McMaster to show that Kohl's stated

reason is only a pretext to conceal that the true motivation for his termination was his age (or, as to his ADA claim, being regarded as disabled.)

McMaster's brief combines his pretext arguments as to his age and disability discrimination claims together.  (Pl.'s Br. at 11& 23-25).

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason:  1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct.  *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).  The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.,* that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id*.

As the Sixth Circuit has explained, "[p]retext is a commonsense inquiry: did the employer make the decision at issue for the stated reason or not?  This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are

a pretext for unlawful discrimination.  *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

The Court concludes that McMaster has directed the Court to evidence that, *viewed in the light most favorable to him*, is sufficient to create an issue of fact as to pretext.  That evidence includes:

- McMaster testified that another employee made "old jokes," about him, in the presence of Ruffing, and Ruffing did nothing about it. McMaster testified that one such joke or comment was that "when I started at Kohl's they had horse troughs out in front."  (Pl.'s Dep. at 246).

- McMaster worked for Kohl's for more than thirty years.  It is undisputed that he was never disciplined or written up for anything.  It is also undisputed that McMaster never had an annual performance review of less than satisfactory.

- Ruffing testified that he discussed alleged performance issues with McMaster (which McMaster does not recall having occurred) but admits he never put any of those concerns in any kind of formal company notice.

- Ruffing testified that he spoke with his boss about taking "next steps" if McMaster's performance did not improve, and that such steps could include a 30/60/90 plan, yet never did anything other than have alleged informal conversations with McMaster before terminating him.

- Ruffing testified that he may have recognized McMaster "for excellent T2 results" just a few months before McMaster was terminated.  (Ruffing Dep. at 151).

- Loretta Roszczewski testified that the day before McMaster was terminated, she "recognized [McMaster] for a partnership and excellent year-to-date results and put it on a recognition form."  (ECF No. 46 No. 95-4, Roszczewski Dep., at 46).

- The unusual circumstances of the termination of this long-standing employee: McMaster testified that he was terminated, during a Skype conference, without being given any reason for his termination.  (Pl.'s Dep. at 234-35 & 239).  He further testified that he had no sense going into that meeting that his job may be in jeopardy because of performance issues or any other reason.  (*Id*. at 239-40).

- McMaster was not given a termination letter from Kohl's.

- Roszczewski, McMaster's business partner at Kohl's, testified that the reason for McMaster's termination was not shared with her.  (Roszczewski Dep. at 50).

Construing all of this evidence, collectively, *in the light most favorable to McMaster*, this Court concludes that he has submitted sufficient evidence of pretext to survive summary judgment.

## II.   Disability Discrimination Claim

Title I of the ADA prohibits covered employers like Kohl's "from 'discharging' an employee because the employee is disabled, because the employee had a record of being disabled, or because the employer 'regards' the employee to be disabled." *Babb v. Maryville Anesthesiologists, P.C.*, 942 F.3d 308, 318 (6th Cir. 2019) (quoting 42 U.S.C. §§ 12102(1), 12112(a)).  This means that, under the ADA, "your employer can't fire you because they *think* you are disabled, even if, in fact, you are *not* disabled." *Babb,* 942 F.3d at 310-11 (emphasis in original); *see also Harrison v. Soave Enter.*, LLC, 826 F. App'x 517, 526 (6th Cir. 2020).  That is what McMaster claims happened here.

McMaster alleges that Kohl's violated the ADA by discriminating against him and terminating his employment because Kohl's regarded him as disabled.  During his deposition, McMaster testified that Ruffing considered him disabled and that he did so because of his heart attack/heart issues and the "mental issues" / "depression issue[s]" he had experienced.  (Pl.'s Dep. at 254 & 258-59).  Thus, like *Babb* and *Harrison*, this case involves an ADA claim based upon on the "regarded as" prong of disability discrimination.

Through amendments to the ADA made in 2008, "Congress liberalized the 'regarded as having an impairment' avenue of proving a disability under § 12102." *Harrison, supra*, at 525; *see also Babb, supra* at 318-19.  Accordingly, as the Sixth Circuit held in *Babb*, and more recently explained in *Harrison*:

21

> [T]he "regarded as" provision of the ADA now states that, for an employer to
> make out a "regarded as" claim, the employee must establish: "that he or she has
> been subjected to an action prohibited under this chapter because of an actual or
> perceived physical or mental impairment *whether or not the impairment limits or
> is perceived to limit a major life activity*." 42 U.S.C. §12102(3)(A) (emphasis
> added).  There is a limitation to this provision, however: "regarded as"
> impairments "shall not apply to impairments that are *transitory and minor*," *Babb*,
> 942 F.3d at 319 (quoting 42 U.S.C. § 12102(3)(B) (emphasis added).  Therefore,
> the "transitory and minor" limitation acts as an affirmative defense of which the
> employer bears the burden of proving.  *Id.*
>
> Ultimately then, "to state the threshold condition of a 'regarded as' ADA claim,
> an employee need only show that [her] employer believed [she] had a 'physical or
> mental impairment,' as that term is defined in federal regulations." *Id.*  "The
> employer may then rebut this showing by pointing to objective evidence 'that the
> impairment is (in the case of an actual impairment) or would be (in the case of a
> perceived impairment) both transitory and minor.'" *Id.*

*Harrison*, 826 F. App'x at 525-526.

In *Harrison,* the plaintiff employee asserted an "as regarded" disability discrimination

claim under the ADA and the district court granted summary judgment to the defendant

employer on that claim.  On appeal, the Sixth Circuit reversed.  In doing so, it stated that the

plaintiff "has sufficient evidence for a reasonable jury to find that she has a qualifying ADA

'disability' under the 'regarded as having [ ] an impairment' by her employer prong, see 42

U.S.C. § 12102(1)(C), *given Defendants' knowledge of her knee injury*." *Harrison*, 826 F. App'x

at 525 (emphasis added).  After describing the new relaxed standard that pertains to as-regarded

ADA claims, the Sixth Circuit "conclude[d] that a genuine dispute of material fact exists with

respect to [the plaintiff's] perceived disability, and her employer's perception of such" because

the record presented indicated that the plaintiff's employers "*knew about* her injury." *Id*. at 526.

(emphasis added); *see also McGonegle v. Select Comfort Retail Corp.*, 2021 WL 229038 (S.D.

Ohio Jan. 22, 2021 at *8 (Post-*Babb* district court decision explaining that "[i]n short, to proceed

on a regarded-as-disabled theory, [the plaintiff] need only show that [the employer] knew or believed that he had an 'impairment' of some kind.  If he can, then the burden shifts to [the employer] to show that [the plaintiff's] impairments were transitory and minor.  If it cannot do so, then [the plaintiff's] regarded-as-disabled argument satisfies the prima facie case at the first *McDonnell Douglas* step."); *Thompson v. Fresh Products, LLC,* 2021 WL 139685 at *9 (6th Cir. Jan. 15, 2021) (finding the plaintiff had established a fact dispute as to whether she was regarded as disabled where she testified she told one supervisor she "she wanted part-time work because she was having issues with her medical condition" and told another one she wanted "to go part-time so that she could have work done on her back.").

McMaster may proceed with a "regarded as" disability claim in this case with either direct or circumstantial evidence.  *Babb, supra.*

### A.  Direct Evidence

"First, an employee may 'put [ ] forth direct evidence that [the employer] had a discriminatory motive in carrying out its employment decision.' *Smith v. Chrysler Corp*., 155 F.3d 799, 805 (6th Cir. 1998); *see, e.g., Baum*, 764 F. App'x at 547 (employer told employee with a heart condition that he was being fired because of his 'health issues and doctors appointments')."  *Babb*, 942 F.3d at 319.

McMaster's brief asserts that he can establish his ADA claim through both direct and circumstantial evidence.   (Pl.'s Br. at 11).  This Court fails to see how McMaster has presented such direct evidence in support of his claim (ie, evidence that he was terminated because of his heart or depression issues).

### B.  Circumstantial Evidence-Approach

If such direct evidence "is not forthcoming," as is usually the case, then an "employee may point to circumstantial evidence of discrimination" under the familiar *McDonnell-Douglas* burden-shifting framework. *Babb*, 942 F.3d at 319-20. This standard requires the employee first to establish a "prima facie case of discrimination" by showing that: 1) he or she is disabled (or regarded as such); 2) he or she is otherwise qualified for the position, without or without reasonable accommodation; 3) he or she suffered an adverse employment action; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled person was replaced. *Id.*

If the employee can establish a prima facie case, the remaining framework is as explained by the Sixth Circuit in *Babb*:

> Once the employee meets that "not onerous" requirement, *id*. at 894 (quotation omitted), the employer must then offer a "legitimate explanation for its action," which is also rarely an onerous requirement, *id*. at 892 (quotation omitted). After the employer does that, "the burden then shifts back to the [employee], who must introduce evidence showing that the [employer's] proffered explanation is pretextual." *Id.* (quotation omitted). Generally speaking, an employee can show that an employer's explanation was pretextual in "three interrelated ways": "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id*. at 895 (quoting *Romans v. Mich. Dep't of Human Servs*., 668 F.3d 826, 839 (6th Cir. 2012)). "However, the [employee] may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (quoting *White v. Baxter Healthcare Corp*., 533 F.3d 381, 393 (6th Cir. 2008)). And, of course, we must always keep in mind that, at summary judgment, the employee "need not prove that the [employer's] proffered rationale is pretextual, as that would be enough proof for summary judgment in favor of the [employee]." *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011). Rather, the employee "must prove only enough to create a genuine issue as to whether the rationale is pretextual." *Id.*

*Babb,* 942 F.3d at 320.

24

Here, Kohl's argues that it is entitled to summary judgment on this "regarded as" ADA claim for two reasons: 1) because no genuine dispute of fact exists as to whether it "regarded" McMaster as disabled; and 2) because no genuine dispute of fact exists as to whether its stated reason for terminating McMaster was a pretext to fire McMaster on the basis of his perceived disability.

### 1. First Element Of Prima Facie Case – Regarded As Disabled

In challenging McMaster's ability to establish the first element of a prima facie case, Kohl's does not appear to dispute that Ruffing and others at Kohl's were aware of McMaster's heart issues and his mental health issues. Kohl's appears to take the position that the first element is not established, somehow, because Ruffing was supportive of McMaster's requests to take time off to take care of himself and attend to needed medical appointments. (*See* Def.'s Br. at 17-18). Kohl's also appears to argue that Ruffing's alleged expression of concern with McMaster's health conditions, and how he was doing, cannot be held against him. (Def.'s Br. at 18). In this regard, Kohl's directs the Court to an unpublished opinion from outside the Sixth Circuit.

Under the Sixth Circuit authority discussed above, there is enough evidence, viewed in the light most favorable to McMaster, to establish that Ruffing and others at Kohl's were aware of McMaster's heart issues and his issues with depression. Thus, McMaster has submitted sufficient evidence to establish a fact dispute as to whether he was regarded as disabled. And Kohl's motion did not make any arguments as to whether the conditions are "transitory or minor." As such, McMaster has established a prima facie case of discrimination.

### 2. Kohl's Stated Reason For Terminating McMaster And McMaster's Proffered Evidence Of Pretext.

Because McMaster has met his "not-onerous" burden of establishing a prima facie case of disability discrimination, the burden shifts to Kohl's to state a legitimate, nondiscriminatory reason for McMaster's termination.  If Kohl's does that, then the burden shifts back to McMaster to show that reason is pretextual.

The analysis of this issue is the same analysis set forth above, in Section I. B. 2. of this Opinion and Order.  As explained there, this Court concludes that McMaster has submitted sufficient evidence, when viewed in the list most favorable to him, to show pretext.

## III.    Sex Discrimination Claim

Count Three of McMaster's Amended Complaint asserts a sex discrimination claim under Michigan's ELCRA.

In its opening brief, Kohl's challenges that claim and seeks summary judgment in its favor.  McMaster's response brief  does not respond to Kohl's challenge to his sex discrimination claim.   Defendant's reply therefore asserts that McMaster has abandoned his sex discrimination.  (Reply Br. at 7) (citing *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 410 (6th Cir. 1992).

At the February 4, 2021 hearing, Plaintiff's counsel confirmed that Plaintiff wishes to abandon his sex discrimination claims asserted in Count Three.  Thus, the Court shall grant summary judgment in favor of Defendant as to Count Three.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Summary Judgment Motion is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED to the extent that the Court RULES that Defendant is entitled to summary judgment in its favor as to

McMaster's sex discrimination claims asserted in Count Three.  The motion is DENIED in all
other respects.  Thus, McMaster's age and disability discrimination claims (Counts One and
Two) shall proceed to a jury trial.

     IT IS SO ORDERED.

s/Sean F. Cox               
Sean F. Cox
United States District Judge

Dated:  February 8, 2021